OPINION
{¶ 1} Appellant, Wayne E. Ferguson, appeals his conviction, following a jury trial, by the Ashtabula County Court of Common Pleas for rape. At issue is whether appellant's conviction was against the manifest weight of the evidence. For the reasons that follow, we affirm.
 {¶ 2} On August 18, 2006, the Ashtabula County Grand Jury returned an indictment against appellant, charging him with one count of rape, a felony of the first degree, in violation of R.C. 2907.02, and one count of sexual battery, a felony of the *Page 2 
third degree, in violation of R.C. 2907.03. On November 8, 2006, appellant entered a plea of not guilty at his arraignment, and the case proceeded to jury trial on January 17, 2007.
 {¶ 3} Rhonda Hibdon testified that in June, 1998, she was 19 years old and residing in Painesville, Ohio. On Saturday, June 6, 1998, Rhonda came to stay with her mother Laura Cooper and her stepfather Julius Cooper for the Father's Day weekend at their home on West 38th Street in Ashtabula, Ohio. Rhonda's mother married Mr. Cooper when Rhonda was two years old and he raised her as his own daughter.
 {¶ 4} Rhonda testified that when she visited her parents, she slept in the upstairs television room on a daybed, which is a couch that opens up into a bed. She said she sleeps on her stomach or side with one leg pulled up, leaving her buttocks exposed. She testified that during her entire life she has been a very heavy sleeper, and has great difficulty waking from a deep sleep. She has sought medical treatment for this condition.
 {¶ 5} Appellant is Mr. Cooper's cousin. He would often visit the Coopers, and Rhonda had always had a good relationship with him. She called him her "Uncle Wayne." As of June, 1998, appellant was 40 years. At that time he was staying with the Coopers. He slept in the living room downstairs on the couch.
 {¶ 6} In the early morning hours of Sunday, June 7, 1998, at around 2:30 a.m., Rhonda was asleep upstairs on the daybed when she heard her mother's dog barking downstairs. She then heard someone pounding on the front door. Rhonda came downstairs and saw appellant was at the door. She opened the door for him and saw he was drunk. *Page 3 
 {¶ 7} Appellant had a bottle of gin and a beer, and Rhonda told him he was not allowed to bring alcohol in the house. She took it from him and put the beer in a baby stroller and the gin in a wagon, both of which were on the front porch.
 {¶ 8} When Ronda came back in the house, appellant asked her to make him something to eat. She refused, told him to make himself a sandwich, and went back upstairs to bed. Later, Rhonda heard appellant fall on the stairs. He walked up the stairs and sat on the edge of Rhonda's bed. While appellant was talking to Rhonda, he put his arm around her, and she said, "you're drunk, don't touch me." At that time Rhonda went back to sleep.
 {¶ 9} Before going to sleep Rhonda had taken Benadryl for her sinuses, which causes her to sleep even harder than usual.
 {¶ 10} Sometime later Rhonda awoke feeling something touching her face, and she realized that appellant had kissed it. He then got up and went downstairs. Rhonda also felt something wet between her legs. She testified semen was coming from her vagina and running down her leg.
 {¶ 11} Rhonda saw appellant's coat was still on the other couch in the room. She picked it up and went downstairs. When she saw him, she threw his coat at him and asked why he had done that to her. He said, "Shh, baby, I'm sorry." Then she said, "no, why did you do that to me?" and he said, "I didn't do nothing." She told appellant she was going to tell her parents. She went to their bedroom and knocked on the door. She told her father that appellant had just raped her. Mr. Cooper left the room to talk to appellant, while Rhonda stayed in the bedroom with her mother. Appellant denied having engaged in any sexual activity with Rhonda and said, "I'm not *Page 4 
like that." He then left the house. Rhonda had not given consent to appellant to have sexual intercourse with her.
 {¶ 12} Mr. Cooper took Rhonda and Mrs. Cooper to the emergency room of Ashtabula County Medical Center and called the police. Rhonda reported to hospital staff that she had been raped. Officer Trask from the Ashtabula Police Department arrived and interviewed Rhonda, and took the rape kit prepared by staff from the hospital back to the police station.
 {¶ 13} According to Rhonda's medical chart, which was admitted in evidence, she told staff that her "dad's cousin came to her house drunk and while she was sleeping, he `raped' her." A pelvic examination was performed by Robert Gershkowitz, M.D. The Rape Protocol Checklist indicates that vaginal swabs were collected from Rhonda. The "victim's medical history and assault information" taken from Rhonda indicates that there was "successful" penetration of her vagina as well as ejaculation. The emergency room report indicates that Rhonda provided the following history: "At around 4:00 o'clock a.m. the patient was raped * * * where there was only vaginal penetration and he ejaculated only in her vagina." Dr. Gershkowitz' diagnosis was "alleged sexual assault with vaginal penetration and ejaculation."
 {¶ 14} After Rhonda was discharged from the hospital, she returned to her parents' home. Later that day she provided a written statement to the detective assigned to her case. Rhonda testified she repeatedly called the Ashtabula Police Department to check on the status of her report between 1998 and 2003, until she believed the police would not pursue her case. *Page 5 
 {¶ 15} Julius Cooper, Rhonda's stepfather, testified that Rhonda has always been a heavy sleeper. He said that when she was a child, she constantly overslept and had great difficulty waking in the morning. He testified that in June, 1998, appellant, who is his cousin, was staying with them because he was helping them remodel their home.
 {¶ 16} Mr. Cooper testified that on June 7, 1998, sometime after 4:00 a.m., Rhonda banged on his and his wife's bedroom door. She was frantic. When he came to the door, he saw she was crying and shaking. Rhonda said appellant had raped her. Mr. Cooper then confronted appellant, who denied Rhonda's allegations and said, "I'm not like that." Mr. Cooper took Rhonda and her mother to the emergency room and called the police.
 {¶ 17} Detective Sean Ward of the Ashtabula Police Department testified that in February, 2006, Rhonda called him stating she had been raped in 1998 and asked him to check on the status of her case. He located her case file and the evidence, including the rape kit, that had been preserved from the 1998 investigation. He learned his department had never submitted the rape kit to the Bureau of Criminal Identification and Investigation ("BCI").
 {¶ 18} Detective Ward testified that in March, 2005, Texas Ranger Chris Love had sent him two saliva swabs taken from appellant containing his DNA profile. Detective Ward submitted the rape kit and the known DNA swabs to BCI in Richfield, Ohio for analysis.
 {¶ 19} Brenda Gerardi, a forensic scientist at BCI, testified that DNA, which stands for deoxyribonucleic acid, is a molecule which contains the genetic code for life *Page 6 
and is found in all living cells. It is unique to each individual. She testified that, due to its uniqueness, BCI can use a forensic unknown sample and compare it to a known reference sample to determine if the source of the DNA in the known sample is the source of the DNA in the forensic sample.
 {¶ 20} Melissa Zielaskiewicz, another forensic scientist at BCI, testified that on February 23, 2006, the rape kit for this case was submitted for analysis. She analyzed vaginal swabs, which tested positive for the presence of semen, and she performed a DNA analysis. The differential extraction of the vaginal swabs resulted in two DNA profiles. The non-sperm profile was consistent with Rhonda's DNA, and the sperm profile was consistent with appellant's DNA. She testified the vaginal swabs contained the DNA of both Rhonda and appellant. She also testified that appellant's sperm was found on the vaginal swabs taken from Rhonda. She said the expected frequency of occurrence of the DNA profile identified on the sperm fraction of the vaginal swabs is one in 30 quintillion 860 quadrillion individuals. In other words, the likelihood of someone's DNA matching the DNA on the sperm portion of Rhonda's vaginal swabs was one in 30 quintillion 860 quadrillion individuals. She said this exceeds the number of people on earth.
 {¶ 21} James Oatman, former detective with the Ashtabula Police Department, testified he was assigned to this case the same day it was reported. He went to the Coopers' house and, based on information provided by them, collected items he believed had evidentiary value. He collected a bottle of Seagram's gin he found in a child's wagon on the front porch and a Miller's beer he found in a stroller on the porch. He later returned to the house and took a written statement from Rhonda. He took a *Page 7 
series of photographs, marked as exhibits in trial, which showed the upstairs television room, the open daybed, the porch, the bottle of gin in the wagon, and the beer in the stroller, all as referenced by Rhonda.
 {¶ 22} Detective Oatman testified appellant came to the police station to speak with him, and after he gave appellant his Miranda rights, he provided a written statement. Appellant admitted he arrived at the Coopers' house where he was staying sometime between 1:00 a.m. and 3:00 a.m. He said he had been drinking all day and was drunk. He knocked on the door and Rhonda let him in. He said he had a bottle of gin and a beer, and Rhonda put them "somewhere" because alcohol was not allowed in the house. Rhonda went upstairs and he followed her. He went back downstairs to lock the door, and he tripped on the stairs as he went down.
 {¶ 23} He said he went back upstairs and Rhonda was laying on the daybed. He sat on the edge of the bed, and, according to him, Rhonda said he could get in bed with her, which he did. He said that sometime later, he awoke and staggered downstairs where he passed out again. Later, Rhonda came downstairs and told him to leave because she was going to tell her father that he had raped her. He said that when Rhonda's father confronted him, he said, "You know I wouldn't do nothing like that." He said he was in bed with Rhonda for two or three hours, and that he did not touch her in a sexual way. Then, later, when asked in the statement if he had sex with Rhonda, he said, "I don't know what happened." Finally, he said, "She knew that I was drunk. You don't let someone in bed that's that drunk." Appellant presented no witnesses on his behalf. *Page 8 
 {¶ 24} Following the presentation of the evidence, the case was submitted to the jury on January 18, 2007, and on that day, the jury returned a verdict of guilty on both counts. On June 14, 2007, the matter came on for sentencing and a sexual predator hearing. Following the hearing, the court merged count one, rape, with count two, sexual battery, for purposes of sentencing, finding them to be allied offenses of similar import, pursuant to R.C. 2941.25. The court sentenced appellant to ten years in prison. After considering the opinion of Jeff Rindsberg, Psy.D., Clinical Psychologist, the court found appellant to be a sexually oriented offender.
 {¶ 25} Appellant appeals his conviction, and asserts the following assignment of error:
 {¶ 26} "THE JURY'S VERDICT FINDING THE APPELLANT GUILTY OF SEXUAL BATTERY AND RAPE WERE [SIC] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 27} Under his assignment of error, appellant does not dispute that sufficient evidence was presented for him to have been convicted of rape and sexual battery. In fact, he concedes that a manifest weight argument can only be upheld "after the state has presented sufficient evidence." However, he argues the victim Rhonda Hibdon's testimony was not credible and his conviction was therefore against the manifest weight of the evidence. Appellant concedes in his appellate brief that "[t]here is no question that sexual intercourse occurred," but argues the issue is whether the victim's testimony was sufficiently reliable for the jury to have found him guilty.
 {¶ 28} Although a conviction may be sustained as having been based on sufficient evidence, "a court of appeals may * * * nevertheless conclude that [the] *Page 9 
judgment is against the weight of the evidence." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52.
 {¶ 29} There is a fundamental distinction between a challenge to the sufficiency of the evidence and a challenge to the weight of the evidence. The legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different from each other. Id. at 386. An appellate court reviewing the sufficiency of the evidence examines the evidence admitted at trial and determines whether, after viewing the evidence most favorably to the state, the jury could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, 273.
 {¶ 30} In contrast, the weight of the evidence concerns the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue rather than the other.Thompkins, supra, at 387. If, on weighing the evidence, the jury finds the greater amount of credible evidence sustains the issue that a party seeks to establish, that party will be entitled to its verdict. Id. "Weight is not a question of mathematics, but depends on its effect ininducing belief." (Emphasis sic.) Id., citing Black's Law Dictionary (6th ed. 1990), 1594. Thus, a court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way. State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-*15.
 {¶ 31} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Page 10 State v. Martin (1983), 20 Ohio App.3d 172, 175. Hence, the role of a reviewing court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. State v. Brown, 11th Dist. No. 2002-T-0077, 2003-Ohio-7183, at ¶ 52, citingThompkins, supra, at 390. However, an appellate court must defer to the factual findings of the jury regarding the weight to be given the evidence and credibility of the witnesses. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 32} When examining witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan (1986),22 Ohio St.3d 120, 123. The factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. Brown, supra, at ¶ 53. Moreover, if the evidence admits to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. Id. "As trial courts often note, proof beyond a reasonable doubt does not mean proof beyond any doubt." State v. Burgess, 11th Dist. No. 2002-L-019, 2004-Ohio-3338, at ¶ 37. "Moreover, `while inferences cannot be built on inferences, several conclusions can be drawn from the same set of facts * * *.'" Id., citing State v. Lott
(1990), 51 Ohio St.3d. 160,168.
 {¶ 33} Appellant was found guilty of rape, in violation of R.C. 2907.02(A)(1)(c), which provides: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *, and the offender *Page 11 
knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *."
 {¶ 34} "Sexual conduct" is defined at R.C. 2907.01(A) as follows: "vaginal intercourse between a male and female * * *. Penetration, however slight, is sufficient to complete vaginal * * * intercourse."
 {¶ 35} Appellant was also convicted of sexual battery, in violation of R.C. 2907.03(A)(3), which provides: "No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender knows that the other person submits because the other person is unaware that the act is being committed."
 {¶ 36} Appellant argues it is "impossible to believe a woman would not know that sexual intercourse was occurring," as Rhonda testified, and, as a result, he argues the jury's finding was against the manifest weight of the evidence. Appellant has not cited any authority in support of this argument.
 {¶ 37} From our independent research, we observe that the Eighth Appellate District considered a case substantially identical to the case sub judice. In State v. Tollivar (July 31, 1997), 8th Dist. No. 71349, 1997 Ohio App. LEXIS 3390, the victim had been out with friends and had consumed six cans of beer. She returned to her home at 1:00 a.m., and, after putting her child in bed, fell into a deep sleep from which she did not awake until morning. The next morning the victim noticed a vaginal discharge and when her daughter inquired about the man who had been there, the victim realized she had engaged in sexual intercourse during the night and learned she had been alone with the defendant in her bedroom. Later that day she called the police and obtained an examination at the emergency room after informing staff she believed *Page 12 
she had been raped during her sleep. Tests revealed sexual intercourse. The victim testified that, being asleep, she did not consent to sexual intercourse and that she had no memory of the event. The defendant testified that at 2:00 a.m., he left a bar and went to visit the victim's roommate. He testified that while there, he said he needed to use the bathroom, and, after using it, he visited the victim in her bedroom, engaged in consensual sexual intercourse with her, and then left. The defendant was found guilty of sexual battery and he appealed. The appellate court affirmed, holding that where "the state presented evidence that [the defendant and the victim] * * * engaged in sexual intercourse, that at the time [the victim] was in a state of deep sleep and/or drunkenness, and that she had not consented to intercourse with [the defendant], * * * the jury could infer her condition substantially impaired her ability to control her conduct," and that such evidence was sufficient to support a jury verdict finding the defendant guilty of sexual battery. Id. at *8-*9.
 {¶ 38} The Ninth Appellate District considered a manifest weight argument in circumstances nearly the same as those present here. InState v. Snyder (Feb. 3, 1999), 9th Dist. No. 18923, 1999 Ohio App. LEXIS 242, the victim was a student at the University of Akron. She testified she was a heavy sleeper. On the evening of the offense, she consumed three beers at 9:00 p.m., and then returned to her room. She went to sleep alone in her bed at 3:00 a.m. While she was sleeping, the defendant came into her room and penetrated her vaginally. She awoke because someone was having sex with her. At that time the man, who she did not know, was on top of her and his penis was in her vagina. He asked her if she wanted him to ejaculate in her. She *Page 13 
said she did not and he left. The defendant challenged the sufficiency and weight of the evidence. The court held:
 {¶ 39} "A jury can reasonably infer that a victim was substantially impaired and unable to control her conduct for purposes of sexual battery when the evidence shows that the victim was in a state of deep sleep or drunkenness and did not consent to intercourse. Id. at *4, citing Tollivar, supra.
 {¶ 40} In addressing the defendant's manifest weight argument, the court in Snyder, supra, held:
 {¶ 41} "As to the victim's testimony that she was unaware of the initial penetration, any doubts as to her credibility or of her version of how penetration took place were, in the first instance, within the province of the jury as the trier of fact. * * * This court is unable to conclude that the jury's assessment was wrong. The fact that the victim awoke after defendant had already penetrated her does not affect the jury's ability to conclude from the evidence that the victim was asleep when the initial penetration was made and that defendant knew that she was asleep and was, therefore, unaware of what he was doing." Id. at *8. (Citation omitted.)
 {¶ 42} Rhonda testified she has had serious problems with her sleep throughout her entire life. She falls into a deep sleep and has great difficulty waking. In addition, on the night of the rape, she had taken Benadryl, which makes her sleep even harder than usual. Her stepfather confirmed this condition which, he said, Rhonda has had since childhood. No evidence was presented disputing Rhonda's condition or the effect of Benadryl on her. *Page 14 
 {¶ 43} As noted supra, appellant argues it is impossible to believe Rhonda did not know sexual intercourse was occurring. However, appellant, who did not have a reported history of sleep problems, told the detective he did not know if he had sex with Rhonda. We fail to see why Rhonda's testimony is any less credible than appellant's version of events, particularly in light of Rhonda's explanation as to why she did not wake up and the DNA evidence, which clearly established that appellant had vaginal intercourse with Rhonda.
 {¶ 44} Next, appellant argues Rhonda's account was not credible because she was unable to provide proof that she had sought medical help for her condition. However, she did testify that she had sought medical treatment for this condition, and no countervailing evidence was presented at trial.
 {¶ 45} Appellant argues Rhonda's testimony is illogical because she testified that after she had fallen asleep, she heard her mother's dog barking and also heard appellant pounding on the door. Rhonda testified that she was falling in and out of sleep at that time. As the trier of fact, it was for the jury to decide whether she was awakened by these noises. Appellant also argues that Rhonda's testimony that after she let him into the house, she again fell asleep and later felt him kiss her face, but did not feel him having sexual intercourse with her is illogical. Again, it was for the jury to decide whether Rhonda awoke to find appellant kissing her and whether she had slept through appellant having sexual intercourse with her. In addition, it was for the jury to decide whether Rhonda's use of Benadryl and her sleeping position facilitated appellant's ability to have sexual intercourse with her while she remained asleep. *Page 15 
 {¶ 46} In determining Rhonda's credibility, the jury was entitled to consider, inter alia, "the reasonableness of the testimony" and "all the facts and circumstances surrounding the testimony." 4 OJI 405.20. Rhonda testified she had no reason to be apprehensive about her uncle. She had been around him many times when he had been drunk, and he had never been inappropriate with her. She had no reason to think he would abuse her trust and take advantage of his own niece when she was asleep and unable to defend herself. Further, upon discovering semen running down her leg, Rhonda immediately confronted appellant. Then, while frantic and crying, she told her parents appellant had raped her. She then went to the emergency room, where she reported she was raped by her father's cousin and submitted to a pelvic examination. She filed charges and made a written statement to the police. She thereafter repeatedly followed up with the police until they finally presented her case to the prosecutor in 2006.
 {¶ 47} In addition, the jury was entitled to consider Rhonda's "manner of testifying," her "accuracy of memory," and her "frankness or lack of it" in evaluating her credibility. Id. We observe that Rhonda's testimony was consistent with the history she provided to the emergency room staff and her written statement to Detective Oatman. While appellant did not testify, his version of events was before the jury by way of his comments at the crime scene and his written statement. The jury was entitled to consider the reasonableness of his version of events. We note that when Rhonda's father confronted appellant, he denied having engaged in any sexual activity with her. In his written statement to Detective Oatman, at first he said he told Mr. Cooper he would not do anything like that. He also indicated in his statement he did not touch *Page 16 
Rhonda in a sexual way. Then, later in his statement, he said he did not know what happened. Finally, in his statement he blamed Rhonda for what happened by saying, "She knew that I was drunk. You don't let someone in bed that's that drunk." Appellant thus presented three different versions of the events.
 {¶ 48} The jury was in the best position to view the witnesses and determine their credibility. In finding appellant guilty, the panel obviously chose to believe Rhonda and to discredit appellant's version of events. After thoroughly reviewing the record, we cannot say the jury clearly lost its way and created a manifest miscarriage of justice. We therefore hold that appellant's conviction was not against the manifest weight of the evidence.
 {¶ 49} For the reasons stated in the Opinion of this court, the assignment of error is not well taken. It is the judgment and order of this court that the judgment of the Ashtabula County Court of Common Pleas is affirmed.
 DIANE V. GRENDELL, P.J., TIMOTHY P. CANNON, J., concurs. *Page 1